**CAL DISTRIBUTING CO., Plaintiff,**

v.

**BAY DISTRIBUTORS, INC., Defendant.**

**No. 70–206 Civ. T.**

United States District Court,
M. D. Florida,
Tampa Division.

Dec. 1, 1971.

Lawrence J. Robinson, of Cramer, Robinson, Ginsburg & Ross, Sarasota, Fla., for plaintiff.

Emmet J. Bondurant, and S. Phillip Heiner, of Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., Edward I. Cutler, of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for defendant.

## ORDER

KRENTZMAN, District Judge.

This is a case involving such stalwarts of Bacchanalian lore as Mogen David, Paul Masson, Gallo, Lancer's, Taylor, King, Italian Swiss Colony, and more. Both plaintiff and defendant are distributors of wine. Plaintiff's complaint states a claim for relief under Section 2 of the Sherman Anti-Trust Act.[1]

Defendant asserts that there are no material factual issues remaining when all of the answers to interrogatories, depositions, affidavits and exhibits in the file are considered, and that based upon these facts defendant is entitled to judgment in its favor as a matter of law. Plaintiff asserts that there are unresolved factual issues.

## STIPULATED FACTS

This case has been noticed for jury trial. Trial was continued in order that the Court might consider this motion. Pursuant to the Court's order scheduling a pretrial conference the parties submitted a pretrial stipulation. The following facts are from the stipulation and are not disputed.

Both plaintiff and defendant are Florida corporations, plaintiff having its principal place of business in Sarasota, Florida, and defendant having its principal place of business in Tampa, Florida. Since approximately 1946, the defendant

---

1. 15 U.S.C. § 2.

Bay Distributors, Inc. (hereinafter referred to as Bay or defendant) has been engaged in the wholesale distribution and sale of various brands of wines and distilled spirits in an approximately 13 county area of the west coast of Florida. These wines and distilled spirits are produced and marketed under various trademarks and trade names by several firms, including a line of wines produced by United Vintners, Inc., most of which are marketed under the trade name "Italian Swiss Colony." At all times relevant to this action, Bay has been the exclusive distributor in the Florida west coast area of wines produced by United Vintners.

From 1957 until the present time the plaintiff, Cal Distributing Company (hereinafter referred to as Cal or plaintiff), and its predecessor have been engaged in the distribution and sale at wholesale of various types of malt beverages, including those sold under the Carling Black Label, Carling's Red Cap Ale and Lowenbrau trade marks. In March, 1965, Cal purchased the assets of B & D Distributors, Inc., a Florida corporation with its principal place of business in Sarasota, Florida. B & D Distributors had been acting as a subdistributor of Bay at wholesale for the brands of wines, including United Vintners wines, for which Bay was the exclusive distributor in the Florida west coast area.

During the period between approximately March, 1965, and May 5, 1970, Cal acted as a subdistributor of Bay at wholesale for the brands of wines for which Bay was the exclusive distributor. In addition, since approximately mid-1968, Cal has acted as a direct distributor in the Sarasota area of wines produced and sold under the "Mogen David" trade name. Cal's subdistributor arrangement with Bay was effective only in the Sarasota area, which includes Sarasota and Manatee Counties, and that portion of Charlotte County, Florida, known as Englewood.

No written contract or any other written document evidences Cal's relationship with Bay. At the time when Cal became a subdistributor of Bay for United Vintners wines, Cal was aware of the fact that Bay was the exclusive distributor for United Vintners wines in the Florida west coast area, including the Sarasota area. While Cal was acting as subdistributor of Bay, Cal distributed and sold wine at wholesale to customers located in the Sarasota area. Cal made no sales of wine to customers located outside of the Sarasota area. During this period Bay also sold United Vintners wines at wholesale to customers in the Sarasota area. Although customers in the Sarasota area could have purchased United Vintners products from either Cal or Bay during this period, neither Cal nor Bay actually solicited the customers of the other.

Defendant Bay purchases wine in tank cars, in bulk, and in bottles upon its own order from sources outside of the State of Florida. Bay purchases wines based upon its general business needs without regard to the specific needs or anticipated needs of any particular customer. Wine purchased by Bay in bulk is bottled by Bay in Tampa. Bay stores such wine in its warehouse located in Tampa. Since March 1970, Bay has also stored wine in its warehouse located in Sarasota. Bay sells such wine at wholesale to various subdistributors and retailers. Cal had purchased the wines for which it acted as a subdistributor for Bay, including United Vintners wines, directly from Bay's Tampa warehouse. Cal picked up such wine in its own trucks from the existing stock of goods maintained by Bay in the Tampa warehouse. Neither Bay nor Cal sold, shipped, or delivered wine to customers located outside of the State of Florida.

Some time during the late summer or early fall of 1969, and prior to November, 1969, Bay decided to become the sole distributor of United Vintners products at wholesale in the Sarasota area. During November, 1969, officers of Cal and and of Bay had discussions concerning the possibility that Bay might purchase all or part of the business of Cal. When

such acquisition did not develop, Bay purchased other premises in Sarasota and subsequently opened a warehouse and distribution facility at said premises from which it presently distributes and sells wines and distilled spirits at wholesale to customers located in the southwest Florida area, including the Sarasota area.

On or around May 5, 1970, Bay notified Cal that Bay would no longer sell it United Vintners wines but would continue to sell it, as Bay's subdistributor, all other wines for which Bay was the exclusive distributor. Cal has not ordered any other wines from Bay since May 5, 1970, and has not acted as a subdistributor of Bay since that date. Such other wines would have included both domestic and imported table wines, cocktail wines and dessert wines, purchased by Bay from various suppliers and sold under various trademarks and trade names.

Since May 5, 1970, Cal's business has consisted of its distribution and sale at wholesale of various types of malt beverages and wines produced and sold under the "Mogen David" trade name. Since Bay refused to sell United Vintners products to Cal as a subdistributor Bay has been selling these products to retail businesses to which Cal had been selling them.

Other facts involved in this case are established by affidavit or deposition, and are not effectively refuted. Where relevant such facts will be referenced below.

## QUESTIONS FOR THE COURT

As has been stated, plaintiff's claim for relief is grounded upon Section 2 of the Sherman Anti-Trust Act.[2] Among the elements which plaintiff must establish in order to prevail in this action are either monopolization or an attempt to monopolize. In order to establish a claim for relief for monopolization, defendant must be shown to possess monopoly power in the relevant market, defined as the power to control prices or exclude competition in that market, coupled with the intent to use and preserve that power.[3] In order to establish an attempt to monopolize, plaintiff must show that a dangerous probability that monopoly power over prices and competition exists within the relevant market, coupled with a specific intent to monopolize.[4]

In determining the relevant market the Court is confronted with two questions. First is the relevant geographic market, and second is the relevant product market.

## I. RELEVANT GEOGRAPHIC MARKET

The pleadings, affidavits and depositions on file in this case show that there is no genuine factual dispute as to the relevant geographic market. For some period of time the plaintiff Cal Distributing Co. was the only wholesale distributor of wine with a warehouse and distribution center located in the Sarasota area described above.[5] From this warehouse plaintiff serviced its customers which were located solely in the Sarasota area.[6] Plaintiff contends that

---

2. The Court's jurisdiction in this case is based upon 15 U.S.C. § 16, and 28 U.S.C. § 1337.

3. United States v. Grinnell Corp., 384 U.S. 563, 570–571, 86 S.Ct. 1698, 16 L.Ed. 2d 778 (1966) ; United States v. E. I. DuPont DeNemours & Co., 351 U.S. 377, 389–394, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) ; United States v. United States Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343 (1920).

4. Walker Process Equipment, Inc. v. Food Mach. & Chem. Corp., 382 U. S. 172, 177–178, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) ; Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203, 207–208 (5 Cir. 1969).

5. See deposition of Calvin C. LaHurd, President of Cal Distributing Co., at pp. 24, and 116–17.

6. Pretrial Stipulation, stipulation No. 9.

the Sarasota area is the relevant geographic market within which defendant's market position and the issue of monopoly power should be assessed.[7]

It is not disputed, however, that both before and after Bay's termination of Cal as a subdistributor of United Vintners products, there have been at least six additional companies distributing wine at wholesale in the Sarasota area from warehouses located in Tampa.[8] Each of these six competitors in the wholesale distribution of wine supplies wine in the entire Florida west coast area,[9] including the Sarasota area, from offices and warehouses located in Tampa.[10] Moreover, the cost of transporting wine to retailers throughout the Florida west coast area is not such as to prevent wholesale distributors from supplying this area from Tampa.[11]

The economic significance of the Florida west coast area for wholesale distribution of wine and other alcoholic beverages is recognized by the "Florida Restaurant and Beverage Guide," a monthly trade publication for the alcoholic beverage industry in the Florida west coast area [12]. This publication contains wholesale price lists and suggested retail prices for wines and distilled spirits distributed in the Florida west coast area, which is referred to as the "Tampa market."

All of this evidence leads to the conclusion that the relevant geographic market involved in this case is the Florida west coast area, and not merely the Sarasota area. The only thing in the file conflicting with this conclusion is plaintiff's unsupported contention that the Sarasota area is the relevant market area. Mere denial of demonstrative facts is not sufficient to raise an issue of fact.[13] There is therefore no genuine issue as to the relevant geographic market involved in this case.

## II. RELEVANT PRODUCT MARKET.

The relevant product market involved in this case is not merely United Vintners wines as hinted by plaintiff. The Courts have taken a far broader view of the concept. Guidelines for determining the relevant product market were set forth by the Supreme Court in United States v. E. I. DuPont DeNemours & Co.[14] In that case DuPont produced approximately 75% of the cellophane sold in the nationwide geographic market which was found to exist, and the Court "assumed" that if the relevant product market were cellophane, DuPont would be found to possess monopoly power over that market. The Issue presented was whether competition for sales of cellophane was merely a part of the broader competitive product market for sales of all flexible packaging and wrapping materials. Sales of cellophane comprised only approximately 20% of all sales in this broader product market.

The Court held that the competition between cellophane and other flexible packaging materials was sufficient to prevent cellophane from constituting a separate relevant product market in itself, and that DuPont did not possess monopoly power in the relevant product market found to exist for sales of all flexible packaging materials. The following test was set forth:

"But where there are market alternatives that buyers may readily use for

7. Item 7 of pretrial stipulation, and Item 3 of plaintiff's pretrial statement.

8. LaHurd deposition at pp. 24, 26–27, 124–27; Affidavit of Douglas R. Belden, Vice-President and General Manager of Bay Distributors, Inc.

9. The affidavits of Douglas R. Belden and of Joseph Midulla, President of Tampa Wholesale Liquor Co., contain a delineation of the fourteen counties in the Florida west coast area which look to Tampa for wholesale wine needs.

10. Belden affidavit; Midulla affidavit.

11. Midulla affidavit.

12. Belden affidavit.

13. Woods v. Allied Concord Financial Corp., 373 F.2d 733 (5 Cir. 1967); Bruce Construction Corp. v. United States for Use of Westinghouse Elec. Supply Co., 242 F.2d 873 (5 Cir. 1957); Wilkinson v. Powell, 149 F.2d 335 (5 Cir. 1945).

14. *supra* note 3

their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others. If it were not so, only physically identical products would be a part of the market . . . In considering what is the relevant product market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce', monopolization of which may be illegal." [15]

As can be seen from facts set out above and below, United Vintners wines face direct competition from numerous other brands of wines, especially Gallo wines. The relevant product market in this case, i. e. the "commodities reasonably interchangeable by consumers for the same purposes," is all wine distributed in the relevant geographic market.[16]

## III. MONOPOLY POWER.

The following are the six wholesalers, other than Bay distributors, who distribute wine from Tampa throughout the Florida west coast area: Consolidated Distributors of Tampa, Florida Wholesale Liquor; Key Liquors of Tampa Co.; McKesson Liquor Co.; Tampa Crown Distributors, Inc.; and Tampa Wholesale Liquor Co.[17] Gallo wines provide the primary competition to United Vintner wines;[18] however, both Gallo and United Vintners face direct competi-

tion from all other wines.[19] It is apparent that this competition would prevent Bay from raising the prices of its wines without losing a portion of its present business.[20]

The competition provided by Gallo against Italian Swiss Colony was described by Calvin C. LaHurd, the President of Cal Distributing Co., as "very, very vigorous." [21] It is evident that Gallo, although a recent entry into the Florida west coast market, has made substantial inroads into the market.[22] In fact sales of Gallo wines at wholesale have exceeded Bay's sales of United Vintners wines continuously for each month since December, 1968.[23]

Bay's lack of market power in its sales of United Vintners wine, as well as the competition it faces from the other wines sold in the Florida west coast area, are further illustrated by the fact that since December 1968, the monthly sales of United Vintners wines have never exceeded 22% of the total volume of wine sold to retailers in this area. During this period of time United Vintners sales have averaged less than 18% of the total monthly wine sales by it and its wholesale competitors in the Florida west coast area.[24]

By way of comparison, the monthly sales of Gallo wine by Tampa Wholesale Liquor Company have averaged over 22% of monthly wholesale wine sales in the Florida west coast area since December, 1968. The monthly sales of all wines by Tampa Wholesale during this period averaged over 39% of all wine

15. Id. 351 U.S. at pp. 394–395, 76 S.Ct. at pp. 1006–1007

16. Other cases involving a determination of the relevant product market include: Walker Distributing Co. v. Lucky Lager Brewing Co., 323 F.2d 1 (9 Cir. 1963); Schwing Motor Co. v. Hudson Sales Corp., 138 F.Supp. 899 (D.Md.1956), aff'd 239 F.2d 176 (4 Cir. 1956); E. A. Weinel Construction Co. v. Mueller Co., 289 F.Supp. 293 (E.D.Ill.1968); A–1 Business Machine Co. v. Underwood Corp., 216 F.Supp. 36, 37 (E.D.Pa.1963).

17. LaHurd deposition at pp. 124–27; Belden affidavit; Midulla affidavit.

18. See exhibits attached to Belden affidavit.

19. Belden and Midulla affidavits.

20. Id.

21. LaHurd deposition at pp. 27, 115.

22. LaHurd deposition at pp. 115–16; Deposition of Silvio S. Solari, Sales Manager of Bay Distributors, at pp. 12–14.

23. Belden and Midulla affidavits and attached exhibits.

24. Belden affidavit and Exhibit D thereto.

sold to retailers in the Florida west coast area.[25]

As stated herein Cal completely ceased to act as a subdistributor of Bay in the Sarasota area on about May 5, 1970. Mr. LaHurd described the effect of the termination as follows:

"Q. So you had no reason to believe that it [the termination] was anything other than just a business decision on their [Bay's] part, is that right?

"A. As far as I know, yes . . .

"Q. [T]he effect of what they [Bay] did was to substitute one distributor for another. Isn't that correct?

"A. Well, I was eliminated and he took my place. That is what it amounts to . . .

"Q. Do you have any reason to believe that there is any less competition in that Sarasota area down there now, with Bay in there than was when you were there?
Would it be fair to state that it is about the same?

"A. I would say so, yes . . .

"Q. Has Bay done anything which would have prevented you in any way from obtaining other lines of wines? From buying and distributing wines other than United Vintners wines?

"A. Since May or prior to May?

"Q. At any time. Let's start with since May.

"A. No.

"Q. At any other time?

"A. No.[26]

In this case the issues of fact crucial to plaintiff's case are also issues of law, namely defendant's monopoly power in the relevant market area, or a dangerous probability that monopoly power exists in the relevant market area. The facts set out above are not effectively refuted by anything in the record. Mr. LaHurd

has through affidavit stated his disbelief at figures contained in Exhibit A to the Midulla affidavit. This disbelief is not supported by contrary figures, and is apparently based on the incredible rise in sales of Gallo wines in the area. In this regard the deposition of Silvio Solari, Sales Manager of Bay Distributors, is instructive.

"Q. Is it correct to say that this is a continuing process to try to keep your products before the public as much as possible?

"A. Yes sir . . .
The name of the game is to get maximum exposure for our products; because without that, frankly, you just simply die. With a competitor like Gallo, who is good—and when I say that, I don't like him—but he is a tremendously good competitor. And if you don't do that with your given brands, he will see to it that they eventually disappear off the shelves. That is how strong he is. And I have had experience competing against him all over the country. And you give him an inch and he will take a mile, literally. He is fantastically good. That is the only way I can put it.

"Q. You try to do the same thing though, don't you?

"A. Well, we did. I mean that is the name of the game; but the problem was—and I think Mr. LaHurd knows also—we used to call them 'the brute force' or 'the hogs'. We had all kinds of names for them. But they come in en masse literally and bring in ten or fifteen men from all over the country and just saturate a market.
And when they come into a market, you know immediately that somebody is in town; that you are not the only boy in town anymore.

---

25. Midulla affidavit and Exhibit A thereto.

26. LaHurd deposition at pp. 109–123

They are very strong. I just can't over emphasize how strong they really are." [27]

## CONCLUSION

 Plaintiff appears to argue that in anti-trust cases the issues of relevant geographic market and monopoly power or possibility of monopoly power must always be for the jury. Such an argument would place Rule 56(e), Federal Rules of Civil Procedure, out of anti-trust cases. The Supreme Court of the United States, however, has held that Rule 56(e), applies even to the state-of-mind elements of a Sherman Act action. First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

In this case there is no genuine factual issue as to the question of defendant's monopoly power or the question of the dangerous probability that defendant might gain such power. The evidence leads inescapably to the conclusion that competition in wholesale distribution of wines in the Florida west coast area, including the Sarasota area, is fierce. Bay's termination of Cal as subdistributor in the Sarasota area has had no effect upon this competition.

It is apparent from affidavits and depositions on file which are not effectively refuted that plaintiff has failed to establish that defendant possesses monopoly power or dangerous probability of monopoly power. This is an essential element of plaintiff's claim. Summary judgment will be entered in favor of defendant and against plaintiff. Whereupon, it is

Ordered and adjudged:

Defendant's motion for summary judgment is hereby granted, and summary judgment is hereby entered in favor of the defendant and against the plaintiff as to all claims herein.

---

27. Solari deposition at pp. 12–14.