323 F.2d 787
 Sylvia KLEIN, Executrix of the Estate of Philip Klein
v.
AMERICAN LUGGAGE WORKS, INC., a Rhode Island corporation,
Appellant in No. 14,249, John Wanamaker Philadelphia,
Incorporated, a Pennsylvania corporation, Appellant in No.
14,252, Strawbridge & Clothier, a Pennsylvania corporation,
Appellant in No. 14,250.
 Nos. 14249, 14250, 14252.
 United States Court of Appeals Third Circuit.
 Argued May 20, 1963.
Decided Oct. 15, 1963.
 
 Ernest S. Wilson, Jr., Wilmington, Del. (Wilson & Lynam, Wilmington, Del., on the brief), for appellant, American Luggage Works, Inc.
 Robert W. Sayre, Philadelphia, Pa. (Henry M. Canby, Wilmington, Del., Saul, Ewing, Remick & Saul, Philadelphia, Pa., on the brief), for appellant, John Wanamaker Philadelphia, Inc.
 Miles W. Kirkpatrick, Philadelphia, Pa. (Arthur R. Littleton, Russell C. Dilks, Philadelphia, Pa., William S. Megonigal, Jr., Wilmington, Del., Morgan, Lewis & Bockius, Philadelphia, Pa., on the brief), for appellant, Strawbridge & Clothier.
 David Snellenburg, II, Wilmington, Del. (Killoran & Van Brunt, Wilmington, Del., on the brief), for appellee.
 M. Melvin Shralow, Samuel D. Goodis, Philadelphia, Pa., for National Retail Merchants' Ass'n, amicus curiae, Folz, Bard, Kamsler, Goodis & Greenfield, Philadelphia, Pa., of counsel.
 Before KALODNER, STALEY and SMITH, Circuit Judges.
 KALODNER, Circuit Judge.
 
 
 1
 In this private anti-trust action by a retailer against a manufacturer and two department stores, based on alleged violation of the Sherman Anti-Trust Act,[1] the District Court[2] found that the manufacturer unlawfully exceeded 'limits of permissibility' in maintaining its 'suggested retail price policy', and that the department stores participated with the manufacturer in an illegal price fixing conspiracy, and enjoined the manufacturer from refusing to supply the retailer and 'from affixing or attaching resale prices to its merchandise delivered for resale in the State of Delaware'; and entered judgment for damages against the defendants, 'jointly and severally' in the amount of $12,724.92, and ordered them to pay the retailer's counsel $7,500.00.
 
 
 2
 The crux of the manufacturer's position is that its suggested retail price policy was maintained and enforced within the permissible limits defined by the Supreme Court in United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), and United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).
 
 
 3
 The sum of the contention of the department stores is that they merely sold the manufacturer's products at suggested retail prices and such conduct does not, without more, constitute a violation of the Sherman Act; they played no part in the maintenance or enforcement of the manufacturer's price policy, and they did not agree, 'tacitly' or otherwise, with the manufacturer, or with one another, to sell at suggested retail prices.
 
 
 4
 The retailer's reply to these contentions, as stated in his brief, is that 'the manufacturer's refusal to sell to a retailer who fails to resell at prices stipulated by the manufacturer and adhered to by competing retailers in pursuance of a resale price maintenance structure violates the Sherman Act.'
 
 
 5
 Certain of the District Court's fact-findings are undisputed on this appeal; others are vigorously challenged as comletely lacking in evidential basis.[3]
 
 
 6
 The undisputed fact-findings may be summarized as follows:
 
 
 7
 Philip Klein ('Klein'), now deceased,[4] a citizen of Delaware, owned and operated two discount stores, one in Wilmington, Delaware, and the other just outside the city limits. American Luggage Works, Inc. ('American'), is a Rhode Island corporation engaged in the manufacture and sale of luggage in interstate commerce. John Wanamaker Philadelphia, Inc. ('Wanamaker'), a Pennsylvania corporation, has operated a branch department store in suburban Wilmington since November, 1950. Strawbridge & Clothier ('Strawbridge'), a Pennsylvania corporation, has operated a branch department store in suburban Wilmington since October, 1952.
 
 
 8
 American commenced selling its luggage products to Klein in 1949 and continued to do so until January 23, 1956 when it stopped supplying Klein because he sold below suggested retail prices. American has sold its luggage products to Wanamaker since 1950 except for a period between August 1954 and August 1955 when Wanamaker suspended relations because of its dissatisfaction with the quality of merchandise shipped to it. American has supplied Strawbridge continuously since 1952.
 
 
 9
 It was American's policy to limit its sales to retailers 'willing to respect', as the District Court put it, its suggested retail prices. It listed such prices in its catalogues and on price tags affixed to merchandise which it sold. American's sales representatives were instructed to advise new accounts, other than department stores, that full compliance with suggested retail prices was mandatory. The exception with respect to the department stores was premised on the fact that the suggested prices reflected their normal 'make-up'. American had no formal method of policing adherence to its suggested prices. Failure to adhere to preticketed prices resulted in cessation of the offending retailer's supply.
 
 
 10
 Klein was a 'discount' merchant and continuously sold American's products below suggested prices. Wanamaker and Strawbridge sold at the suggested prices. No express agreement to maintain preticketed prices ever existed between American and either Strawbridge or Wanamaker, nor did American ever seek or receive a commitment from the two stores to maintain such prices. Wanamaker and Strawbridge did not agree with one another to maintain suggested prices.
 
 
 11
 One Louis D. Forman, sales representative of American, serviced its accounts with Klein, Wanamaker and Strawbridge at all times material herein. He established the account with Klein 'with strong suspicion of the latter's discount activities.'
 
 
 12
 From time to time Wanamaker and Strawbridge sales clerks voiced to Forman complaints from potential customers that American luggage was available elsewhere in Wilmington below preticketed prices. A Strawbridge luggage buyer, Lou Spano, at an undetermined time between the opening of the store in 1952 and May 28, 1955, when he left Strawbridge, told Forman that 'someone was selling off price in Wilmington, Delaware.' A Wanamaker luggage buyer, William Leahy, on an occasion prior to February 1, 1953, when he ceased to be Wanamaker's luggage buyer, complained of American's sales to discounters. None of the complaints or comments by the sales clerks or Spano or Leahy made reference to any specific merchant.
 
 
 13
 In January 1956, the president of American and its vice-president in charge of sales visited Klein's Wilmington store in the course of a survey of retailers 'in an effort to ascertain whether the most desirable outlets were utilized in marketing' its luggage products. In the course of the visit Klein's display of the American line was found unattractive, and his discounting activities were discovered, and approximately one week later American sent notice to Klein that it would no longer supply him. Forman, who was unaware of the visit of the American officers to Klein's, at Klein's instance, made inquiries of American as to the reasons for discontinuance of its account and was advised that it was due to the discounting. Later, at a meeting with executives of American, Klein was advised that resumption and continuation of his account was conditional upon adherence to preticketed prices, and when he refused to accede to such an arrangement, American declined to reactivate the account.
 
 
 14
 The District Court held that American violated the Sherman Act when it exceeded 'the limits of permissibility as defined by Colgate' of 'a simple refusal to sell to customers who will not resell at stated prices', and that Wanamaker and Strawbridge 'participated in the unlawful price fixing conspiracy organized by the manufacturer (American)' when they 'complied with the prices established with knowledge that the American scheme required concerted retailer adherence for its effectiveness.'
 
 
 15
 In so holding the District Court 'found', as an ultimate fact, American's 'methods' to be offensive to the Sherman Act in these respects:
 
 
 16
 They went beyond a simple announcement of its policy to refuse dealings with price cutters in that, in the great majority of negotiations for new accounts American 'solicited' from the prospective retailer express assurances that preticketed prices would be observed; in those instances where it didn't do so the dealer was strongly advised of its price maintenance policy; he was deluged with literature which emphasized its importance to the manufacturer and the mechanics and objectives of preticketing were carefully explained, and he was informed that noncompliance with the prices established would be met with the sanction of a refusal to deal.
 
 Said the District Court:[5]
 
 17
 'The thrust of these negotiations served to impart to the prospective retailer knowledge of the concerted and pervasive nature of the price maintenance policy. It was extremely unlikely that an account could be consummated without a tacit agreement by the retailer to comply with the suggested prices-- disclosure of the manufacturer's policies and methods of their effectuation was accomplished in such a way as to render undertaking an account by the retailer tantamount to an implied promise to comply with preticketed prices. Reasonable men could not interpret the purport of the negotiations otherwise. The methods employed by American show conclusively that the limits of Colgate were exceeded in effectuating adherence to the preticketed prices, and induced a price fixing conspiracy or combination among retailers. The Sherman Act forbids such activity.'
 
 
 18
 The District Court premised its holding that Wanamaker and Strawbridge were co-conspirators with American on two fact-findings which are challenged by the two department stores, as being utterly without basis. The first of these findings was that '* * * tacit understandings of crucial import between each defendant retailer on the one hand, and the manufacturer on the other, arose from the continued course of dealing between the parties * * * each defendant retailer knew that the manufacturer expected compliance with the preticketed prices by itself and any other retailer marketing the products * * * each tacitly consented to this arrangement and did in fact sell at the established prices.' The second of the findings was that the two department stores 'volunteered assistance in the ascertainment of non-complying dealers, and could only have done so with the expectation that appropriate sanctions would be imposed upon the offender', and 'this activity on the part of Wanamaker and Strawbridge suffices to implicate each as two of an unknown number of co-conspirators in the unlawful price fixing combination organized by the manufacturer.'[6]
 
 
 19
 First, as to the District Court's ultimate fact-finding that american's 'methods' were offensive to the Sherman Act:
 
 
 20
 This finding was premised on these critical fact-findings, to wit, that American 'solicited' express assurances from prospective retailers that they would comply with pre-ticketed prices; that such retailers were 'strongly advised' of American's price maintenance policy and 'deluged with literature' relating to such policy. These fact-findings are without basis in the testimony and are 'clearly erroneous'. All that the evidence established was that prospective retailers were 'advised' of American's price maintenance policy, and its expectation that those to whom it sold its lines would not sell below pre-ticketed prices.
 
 
 21
 Second, as to the District Court's ultimate fact-finding that Wanamaker and Strawbridge were American's co-conspirators:
 
 
 22
 This finding was premised on the critical fact-findings (1) that 'tacit' agreements existed between the two department stores and American to maintain pre-ticketed prices, and (2) that the stores 'volunteered assistance in the ascertainment of non-complying dealers'. There isn't a shred of evidence in the record to support these fact-findings and they are 'clearly erroneous.' On the score of the foregoing it must be kept in mind that the District Court made the specific fact-finding that 'no express agreement to maintain preticketed prices ever existed between American and either Strawbridge or Wanamaker.' As to the finding that the department stores 'volunteered assistance' in ferreting out non-complying dealers, it is apparent that it was premised on the 'comments and complaints' to American's agent, Forman, by retail personnel of the stores and its buyers, that some undisclosed retailer was cutting prices, but the evidence did not establish that Forman ever reported them to American and the District Court did not find that he did so.
 
 
 23
 It must bo observed that the District Court has, in the instant case, enunciated the novel doctrine that retailers who adhere to suggested retail resale prices, knowing that compliance by competitors is expected by the manufacturer in consonance with his price maintenance policy, thereby, without more, become co-conspirators with the manufacturer.
 
 
 24
 The hard core of that doctrine is that 'conscious parallelism' in behavior is per se conspiratorial conduct. It need only be said that the Supreme Court has held to the contrary in Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). It was there said (346 U.S. pp. 540-541, 74 S.Ct. pp. 259-260, 98 L.Ed. 273):
 
 
 25
 'The crucial question is whether respondents' conduct toward petitioner stemmed from independent decision or from an agreement, tacit or express. To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreemint (citing cases). But this Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense. Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but 'conscious parallelism' has not yet read conspiracy out of the Sherman Act entirely.'
 
 
 26
 The applicable rule was concisely epitomized in United States v. Standard Oil Company, 316 F.2d 884 (7 Cir. 1963) as follows, at p. 890:
 
 
 27
 'The substantive law of trade conspiracies requires some consciousness of commitment to a common scheme.'
 
 
 28
 For the reasons stated the Order of Judgment of the District Court will be reversed and the cause remanded with directions to proceed in accordance with this opinion.
 
 
 
 [1]
 15 U.S.C.A. 1
 
 
 [2]
 The case was tried to the court without a jury
 
 
 [3]
 The District Court's opinion is reported at 206 F.Supp. 924 (D.C.Del. 1962). The fact-findings and conclusions of law were not specially made but were incorporated in the opinion
 
 
 [4]
 Sylvia Klein, executrix of the estate of Philip Klein, is the substituted plaintiff
 
 
 [5]
 206 F.Supp. 943
 
 
 [6]
 Id., 206 F.Supp. 943-944